# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| **DONNA M. SHERWOOD,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| **v.** | ) | **No. 11 C 8968** |
| | ) | |
| **MICHAEL J. ASTRUE, Commissioner of** | ) | **Magistrate Judge Susan E. Cox** |
| **Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION & ORDER

Plaintiff, Donna Mae Sherwood, seeks judicial review of a final decision of the Commissioner of the Social Security Administration ("SSA") denying her application for a period of disability and disability insurance benefits ("disability benefits") under Title II of the Social Security Act, 42 U.S.C. §§ 216(i) and 223(d) ("the Act").[1] Ms. Sherwood has filed a motion for summary judgment, seeking to reverse the Commissioner's final decision or remand the matter for additional proceedings [dkt. 20]. The Commissioner has also filed a motion for summary judgment, requesting that his final decision be upheld [dkt. 26]. For the reasons set forth below, Ms. Sherwood's motion is granted, the Commissioner's motion is denied, and this case is remanded to the ALJ for further findings consistent with this opinion.

## I. PROCEDURAL HISTORY

Ms. Sherwood initially filed a Title II application for disability benefits on August 9, 2006, alleging that her disability began on September 12, 2003.[2] The primary reasons for Ms. Sherwood's

---

[1] R. at 18.
[2] R. at 18.

application for disability benefits related to her degenerative disc disease, lumbar discectomy, scoliosis, ectasia and spinal stenosis, and depression.[3] Further, Ms. Sherwood alleged that she was disabled due, in part, to obsessive-compulsive disorder ("OCD"), anxiety, and a personality disorder.[4] Her claim was initially denied on February 20, 2007.[5] Ms. Sherwood filed a request for reconsideration on April 27, 2007,[6] which was later denied on June 1, 2007.[7] Subsequently, Sherwood filed a written request for a hearing before an Administrative Law Judge ("ALJ") on June 20, 2007, and this request was granted on July 2, 2007.[8] The hearing was originally scheduled for April 9, 2009, but the matter was continued so that Ms. Sherwood could obtain representation.[9] On April 7, 2010, ALJ David W. Thompson presided over an administrative hearing.[10] Following this hearing, the ALJ issued an unfavorable decision on May 13, 2010, finding that Sherwood was not disabled within the meaning of the Act at any time after her application was submitted.[11] On June 8, 2010, Ms. Sherwood filed a request for review of the ALJ's unfavorable decision.[12] After granting Ms. Sherwood additional time to submit new evidence, the Appeals Council denied her request to review the ALJ decision on October 20, 2011, making the ALJ's decision the final decision of the Commissioner.[13] Ms. Sherwood filed this action on December 19, 2011, and she filed her motion

---

[3] R. at 24, 73, 78.
[4] R. at 24.
[5] R. at 18.
[6] R. at 74.
[7] R. at 18.
[8] *Id.*
[9] R. at 45, 89. Ms. Sherwood's previous counsel, Neil H. Good, withdrew from her case on July 22, 2008. R. at 88.
[10] R. at 18.
[11] R. at 29.
[12] R. at 12.
[13] R. at 1.

for summary judgment on May 1, 2012.[14] The Commissioner filed a cross-motion for summary

judgment on June 29, 2012.[15]

## II. FACTUAL BACKGROUND

The facts stated in this section are drawn from the administrative record. This section begins

with an overview of Ms. Sherwood's personal background and medical history before and

immediately after her September 2003 back injury, the onset of Ms. Sherwood's difficulties. Next,

this section will separately summarize the medical records related to Ms. Sherwood's Workers'

Compensation claim in 2003 and the medical records submitted for her current disability benefits

application. Lastly, this section will give a synopsis of the ALJ hearing testimony and the ALJ's

decision.

### A. Ms. Sherwood's Background & Initial Back Injury

Before her back injury in 2003, Ms. Sherwood's medical history was "unremarkable" with

no major injuries or serious medical conditions and only one prior surgery, a hysterectomy that was

completed in 1994.[16] Ms. Sherwood's mental history before her back injury included experiences

with both anxiety and panic, but she had never been hospitalized for any mental illness.[17] Jennifer

Jones, M.D., became Ms. Sherwood's primary physician in April of 2002 and continued in this role

through Ms. Sherwood's current application for disability benefits.[18]

---

[14] Pl. Mot. at 1, dkt. 20.
[15] Def. Mot. at 1, dkt. 26.
[16] R. at 235.
[17] R. 387–88.
[18] R. at 499, 521–66. There are multiple dates in the record indicating when Ms. Sherwood began visiting Dr. Jones. The earliest date listed is April 5, 2002, and it is mentioned in a letter from Dr. Jones to Ms. Sherwood's attorney that was sent on March 25, 2009. R. at 499. In a later report, Dr. Jones recorded Ms. Sherwood's treatment with her as beginning in October 2003. R. at 521.

Ms. Sherwood graduated from high school, but she did not begin working outside of her home until she was 35 years old.[19] From July 1994 to February 2001, Ms. Sherwood was a school bus driver for First Student in Morris, Illinois.[20] Then from March 14, 2001, to February 14, 2003, Ms. Sherwood was an assembly line worker with Brownie Products ("Brownie") in Gardner, Illinois.[21] Lastly, Ms. Sherwood was employed by Bellettini Foods ("Bellettini") as a meat wrapper from July 2002 until September 12, 2003, when she sustained her back injury.[22] Ms. Sherwood described her jobs at Brownie and Bellettini as both involving constant bending, stooping, and standing.[23]

On September 12, 2003, Ms. Sherwood injured her back while trying to lift a box at Bellettini.[24] According to Ms. Sherwood, she bent forward to pick up a heavy box, but then she could not straighten back up.[25] When a butcher came to assist her, he heard a pop in her back.[26] After this injury, Ms. Sherwood experienced extreme sharp pain in the lumbar region of her back, and this pain extended down into her thighs.[27] After attempting to recover in the break room for thirty minutes, Ms. Sherwood was driven home from work.[28] She then went to the emergency department ("ED") at Morris Hospital, where she was diagnosed as having a lumbar strain.[29] Upon being discharged from the ED, Ms. Sherwood was instructed to take Tylenol or ibuprofen for her pain and to follow up with her primary doctor within two to three days.[30]

---

[19] R. at 171.
[20] R. at 215.
[21] *Id.*
[22] R. at 215.
[23] R. at 174.
[24] R. at 288.
[25] R. at 503.
[26] *Id.*
[27] *Id.*
[28] R. at 515.
[29] R. at 503, 505.
[30] R. at 503, 507.

Ms. Sherwood visited her chiropractor, Sean F. Gibbs, D.C., immediately following her back injury on September 13, 2003.[31] Dr. Gibbs took X-rays of Ms. Sherwood's back, and he subsequently diagnosed Ms. Sherwood as having a pinched nerve and administered chiropractic treatment on the basis of this diagnosis.[32] After Ms. Sherwood experienced trouble walking following his treatment, Dr. Gibbs requested that she have an MRI.[33]

Based on Dr. Gibbs' request, Robert G. Dirmish, M.D., completed an MRI of Ms. Sherwood's back on September 22, 2003.[34] Dr. Dirmish's impressions from this MRI were that Ms. Sherwood had diffuse lumbar disc degeneration and circumferential bulging.[35] He noted that there was a large, central and right paracentral herniation of the L2-3 intervertebral disc and that there was moderate L3-4 and mild L4-5 spinal stenosis.[36] After considering this information, Dr. Gibbs referred her to George E. DePhillips, M.D., S.C., for a neurosurgical consultation.[37] Ms. Sherwood last visited Dr. Gibbs on October 11, 2003.[38]

Following Dr. Gibbs' recommendation, Ms. Sherwood first visited Dr. DePhillips on October 2, 2003.[39] During this visit, Dr. DePhillips observed that Ms. Sherwood experienced serious pain in her lower back, which radiated into her anterior thighs down to her knees.[40] Dr. DePhillips noted that the severity of Ms. Sherwood's pain fluctuated and that her legs frequently gave out at her knees.[41] He also stated her chiropractic treatments appeared to help her condition overall, but that

---

[31] R. at 164, 368.
[32] R. at 164.
[33] Id.
[34] R. at 430.
[35] Id.
[36] Id.
[37] R. at 164, 227.
[38] R. at 503.
[39] R. at 227.
[40] Id.
[41] Id.

her symptoms would worsen soon after completion of the treatment.[42] In his recorded impressions, he also recorded that the weakness in Ms. Sherwood's right leg was worse than her left.[43]

Dr. DePhillips recommended an MRI scan, which revealed a large midline disk herniation at the L2-3 level, as well as severe compression of the thecal sac and severe spinal stenosis.[44] He determined that this disk herniation caused Ms. Sherwood's moderate to severe spinal stenosis.[45] Before recommending a discectomy, Dr. DePhillips attempted more conservative treatment and ordered a lumber myelogram and EMG.[46] Dr. DePhillips also ordered a neurological consultation with Syed Mushtaq Naveed, M.D.[47]

Joseph B. Mallory, M.D., completed a lumbar myelogram for Ms. Sherwood on October 13, 2003.[48] Based on this test, he diagnosed her as having scoliosis and noted that she had a marked anterior extradural defect at L2-3, moderate defect at L3-4, and mild defect at L1-2 and L4-5.[49] Dr. Mallory also conducted a CT scan of Ms. Sherwood's lumbar spine.[50] He stated that the most striking abnormality was the L2-3 disc space because the test showed diffuse bulging and marked diffuse posterior herniation, which produced marked compression on the thecal sac.[51] This test also indicated that she had diffuse bulging L3-4 disc with bulging of the L4-5 disc.[52] Dr. Mallory also noted that Ms. Sherwood had borderline spinal stenosis at L3-4 and L4-5 disc space levels.[53]

---

[42] *Id.*
[43] *Id.*
[44] R. at 227, 239.
[45] R. at 227.
[46] *Id.*
[47] R. at 228–29.
[48] R. at 433.
[49] *Id.*
[50] R. at 434.
[51] *Id.*
[52] *Id.*
[53] *Id.*

Dr. Naveed submitted a neurological consultation report to Dr. DePhillips for Ms. Sherwood on October 13, 2003 after conducting an examination.[54] Dr. Naveed's report described Ms. Sherwood's initial injury in September 2003.[55] Dr. Naveed noted that Ms. Sherwood's pain was exacerbated by sitting for long periods of time, bending, lifting, and lying on her left side.[56] Dr. Naveed stated that Ms. Sherwood's pain improved with recent use of Percocet as well as with chiropractic therapy and physical therapy, but that the only clear relieving factor was a heavy dose of Percocet.[57] In his notes from her physical examination, Dr. Naveed described Ms. Sherwood's gait as atypical because she dragged her right leg.[58] Based on her musculoskeletal examination, he identified that she had spasms of the paraspinal muscles and scoliosis.[59] Dr. Naveed performed a nerve conduction velocity test ("NCV") and electromyogram test ("EMG") on October 7, 2003, and Ms. Sherwood's preliminary test results were normal.[60]

Ms. Sherwood returned to Dr. DePhillips on October 16, 2003, after her lumber myelogram revealed a large herniated disc at the L2-3 level with severe compression of the cauda equina.[61] At this time, Ms. Sherwood also complained of some difficulty with bowel movements, and based on this difficulty, Dr. DePhillips recommended surgery.[62]

On October 29, 2003, Dr. DePhillips performed a hemilaminotomy and discectomy on Ms. Sherwood's right side at the L2-3 level at Provena Saint Joseph's Medical Center.[63] There were no

---

[54] R. at 228.
[55] *Id.*
[56] *Id.*
[57] R. at 228.
[58] *Id.*
[59] *Id.*
[60] R. at 232.
[61] R. at 235.
[62] *Id.*
[63] R. at 236.

complications with the surgery, but Ms. Sherwood did experience leukocytosis after the procedure, which could have been caused by the stress of the surgery or a recent case of pneumonia.[64] After Ms. Sherwood underwent this operation, Dr. DePhillips referred her to Ottawa Hospital for physical therapy,[65] which she completed in the summer of 2004.[66] Dr. DePhillips' final diagnosis in his post-operative report was that Ms. Sherwood had degenerative fibrous tissue and nucleus pulpous at Disc L2-3.[67] Manual Corrales, M.D., completed an MRI of Ms. Sherwood's lumbar spine on April 6, 2004.[68] Dr. Corrales reported that there were postoperative changes at the L2-3 level without evidence of disc recurrence or thecal sac compression.[69] Dr. Corrales also noted that Ms. Sherwood still had mild spinal canal stenosis at L3-4 and L4-5 levels, which was unchanged from her exam on September 22, 2003, before her back surgery.[70]

## B. Medical Evidence from Workers' Compensation Claim

After Ms. Sherwood's back injury in September of 2003, she applied for and obtained Workers' Compensation benefits in 2003, and those benefits ended on June 19, 2006.[71] This section will summarize the medical evidence submitted in relation to her 2004 Workers' Compensation Claim.

Alexander J. Ghanayem, M.D., was appointed in relation to Ms. Sherwood's Worker's Compensation claim in 2004.[72] Due to Ms. Sherwood's inability to progress after her surgery and

---

[64] R. at 238.
[65] R. at 164.
[66] R. at 257–77.
[67] R. at 241.
[68] R. at 439.
[69] Id.
[70] Id.
[71] R. at 126. Ms. Sherwood testified at the administrative hearing on April 7, 2010, that she received both weekly benefits and a lump sum settlement of around $120,000. R. at 42.
[72] R. at 164, 353. CorVel Corporation of Peoria, Illinois, managed Ms. Sherwood's Workers' Compensation claim.

with physical treatment, Dr. Ghanayem evaluated Ms. Sherwood and completed an Independent Medical Examination.[73] After reviewing Ms. Sherwood's records and radiographs and examining her on April 15, 2004, Dr. Ghanayem found that the pain in Ms. Sherwood's legs had improved after her surgery, but her back pain remained persistent and disabling.[74] Dr. Ghanayem stated that Ms. Sherwood had attempted physical therapy, but had not progressed.[75] Dr. Ghanayem's impression was that Ms. Sherwood sustained a large disc herniation at L2-3 from her work related injury and that a smaller disk protrusion at L3-4 was probably preexisting.[76] At this time, Dr. Ghanayem thought that Ms. Sherwood had ongoing diskogenic back pain and recommended a diskogram to determine if L2-3, as well as any other disc, may be contributing to her symptoms.[77] Additionally, he stated that at that time, Ms. Sherwood was unable to work.[78]

On May 25, 2004, Eugene G. Lipov, M.D., performed a lumbar discography on Ms. Sherwood to address her lumbar discogenic pain.[79] Ms. Sherwood was referred to Dr. Lipov for this procedure by Dr. Ghanayem because Ms. Sherwood had intractable lower back pain.[80] The lumbar discography showed diffuse degeneration at the L2-3 level, L3-4 level, and L4-5 level.[81] Based on the results of the discography, Dr. Ghanayem determined that Ms. Sherwood had inflammation at the end plates of her vertebrae and instability in her spine, and he recommended that she either undergo another round of physical therapy or a spinal fusion.[82] Ms. Sherwood elected to undergo

---

[73] R. at 164, 353. Jamie Kowalczyk was Ms. Sherwood's case manager for her Workers' Compensation claim.
[74] R. at 333.
[75] Id.
[76] R. at 334.
[77] Id.
[78] Id.
[79] R. at 249.
[80] Id.
[81] R. at 250.
[82] R. at 353.

another round of physical therapy but, again, she was unable to progress due to increasing pain.[83] She returned to Dr. Ghanayem on September 1, 2004, and informed him that she still did not want to proceed with the spinal fusion.[84] Based on Ms. Sherwood's decision, Dr. Ghanayem ordered that a Functional Capacity Evaluation ("FCE") be performed.[85]

On September 21, 2004, Debra W. Yirku, P.T., assessed Ms. Sherwood and completed a FCE.[86] The findings of Dr. Yirku's FCE report suggested the presence of near full, though not entirely full, effort on Ms. Sherwood's part.[87] This description of Ms. Sherwood's effort was not meant to imply intent, but rather stated that Ms. Sherwood could do more physically at times than she demonstrated during the testing day.[88] Regarding the reliability of these findings, Dr. Yirku stated that the test findings in combination with her clinical observations suggested a moderate question to be drawn as to the reliability and accuracy of Ms. Sherwood's subjective reports of pain and limitation.[89] Again, this description was not meant to imply intent but, rather, reflected the opinion that Ms. Sherwood could do more at times than she stated or perceived.[90]

Regarding the reliability of pain reports, Dr. Yirku stated that five of seven Waddell signs were positive and that Ms. Sherwood responded positively to two of seven questions while completing the Waddell Inappropriate Symptom Questionnaire, which indicated inappropriate

[83] Id.
[84] Id.
[85] Id.
[86] R. at 279.
[87] R. at 281.
[88] Id.
[89] Id.
[90] Id.

illness behavior.[91] Additionally, the results of the PACT Spinal Function Sort indicated that Ms. Sherwood's less than sedentary "Rating of Perceived Capacity" was reliable.[92]

The FCE also included the following findings: (1) that Ms. Sherwood could tolerate thirty minutes of sitting, but would need to stand briefly for position change; (2) that Ms. Sherwood could tolerate twenty minutes of standing, but would need to sit briefly for position change; and (3) that ten minutes of walking was the longest duration that Ms. Sherwood could sustain.[93] Lastly, Dr. Yirku stated that due to Ms. Sherwood's lack of full effort, symptom magnification, and reliability issues, rehabilitation recommendations were difficult to provide.[94]

After reviewing Dr. Yirku's FCE, Dr. Ghanayem determined that Ms. Sherwood may have limited functional capabilities, but that the FCE may not be valid in determining her maximum work level.[95] Regardless, Dr. Ghanayem stated that there were objective structural abnormalities that existed in her spine relative to her prior lower back injury and surgical intervention.[96] Based on this information, Dr. Ghanayem set Ms. Sherwood's functional capabilities at the ability to lift fifteen pounds from thigh to chest level on a regular basis and stated that she should be able to sit, stand, and move around throughout the course of the workday.[97] Dr. Ghanayem also stated that a target of an eight-hour workday, five days a week was a reasonable expectation for Ms. Sherwood.[98] He further stated that at this time she was at Maximum Medical Improvement ("MMI") and required no further medical care.[99]

---

[91] R. at 282, 303.
[92] R. at 282.
[93] *Id.*
[94] R. at 283.
[95] R. at 327.
[96] *Id.*
[97] *Id.*
[98] *Id.*
[99] *Id.*

On February 13, 2006, Ms. Sherwood visited Dr. Jones complaining of pain in her right hip and leg.[100] In describing Ms. Sherwood's symptoms, Dr. Jones noted that Ms. Sherwood could not use her right leg for driving, that she was not experiencing bowel or bladder issues, and that after being seated in a car for an hour, she was in severe pain.[101] At this time, Dr. Jones had prescribed to Ms. Sherwood Norco and Neurontin to treat her pain, and after this visit, she increased Ms. Sherwood's dosage of Neurontin.[102] Dr. Jones also advised Ms. Sherwood to obtain another MRI of her spine.[103]

Dr. Dirmish completed this MRI of Ms. Sherwood's spine on February 17, 2006.[104] This MRI indicated that Ms. Sherwood was still experiencing mild lumbar scoliosis and moderate diffuse lumbar disc degeneration and bulging.[105] Dr. Dirmish also noted that Ms. Sherwood had mild L3-4 and L4-5 spinal canal narrowing and an annular tear of the posterior margin of the L3-4 intervertebral disc.[106]

Ms. Sherwood returned to Dr. Ghanayem on March 29, 2006, to reconsider the spinal fusion surgery that he recommended earlier.[107] During this visit, new flexion and extension X-rays were taken of her back, which revealed that between full flexion and extension she went from five millimeters of subluxation to ten millimeters of subluxation at her operative level and that in the neutral position she was off by eight millimeters.[108] Based on these results, Dr. Ghanayem

---

[100] R. at 346.
[101] *Id.*
[102] *Id.*
[103] *Id.*
[104] R. at 454.
[105] *Id.*
[106] R. at 455.
[107] R. at 326.
[108] *Id.*

recommended that Ms. Sherwood undergo an anterior fusion through an anterolateral approach, considering how underweight she was at that time.[109]

Ms. Sherwood stopped receiving Workers' Compensation benefits on June 19, 2006.[110]

## C. Medical Evidence Submitted for Disability Application

Ms. Sherwood applied for disability benefits on August 9, 2006, asserting that her disability began with her back injury on September 12, 2003.[111] Ms. Sherwood alleged that she was disabled due to her degenerative disc disease, lumbar discectomy, scoliosis, ectasia and spinal stenosis, and depression.[112] Additionally, Ms. Sherwood stated that she was disabled in part due to OCD, anxiety, and a personality disorder.[113]

This section will summarize the medical evidence that was submitted for Ms. Sherwood's current disability application. The physicians included in this section are listed in chronological order based on the dates that their evaluations were completed with the exception of Dr. Jones. Dr. Jones was Ms. Sherwood's primary physician starting in 2002, and she completed a Multiple Impairment Questionnaire for Ms. Sherwood on May 13, 2009 and Psychiatric/Psychological Assessment on January 7, 2010.[114] Even though Dr. Jones submitted reports before 2006, she is listed last in this section because she submitted the last evaluations of Ms. Sherwood in relation to this disability application.[115]

### 1. Phillip S. Budzenski, M.D.—State Agency Examining Physician

[109] *Id.*
[110] R. at 126.
[111] R. at 18.
[112] R. at 24, 73, 78.
[113] R. at 24.
[114] R. at 521–37.
[115] R. at 528. Dr. Jones physical assessment of Ms. Sherwood was completed on May 13, 2009.

On December 6, 2006, Ms. Sherwood visited Phillip S. Budzenski, M.D., for a disability evaluation related to her degenerative disc disease and scoliosis.[116] Dr. Budzenski identified Ms. Sherwood's chief complaint as being degenerative disc disease and scoliosis.[117] At the time of her visit, Ms. Sherwood was taking Lodine, Norco, and Gabapentin.[118] Dr. Budzenski's final impressions of Ms. Sherwood were that she experienced scoliosis, anorexia, mood symptoms, and tobacco abuse.[119] In regards to her ability to work, Dr. Budzenski stated that Ms. Sherwood should be able to perform light work eight hours a day.[120]

### 2. Richard Bilinsky, M.D.—State Agency Reviewing Physician

On January 10, 2007, Richard Bilinsky, M.D., completed a physical Residual Functional Capacity Assessment ("RFC") for Ms. Sherwood, and degenerative disc disease was his primary diagnosis.[121] This report listed the following external limitations for Ms. Sherwood: (1) she could occasionally lift and/or carry a maximum of twenty pounds; (2) she could frequently lift and/or carry a maximum of ten pounds; (3) she could stand and/or walk (with normal breaks) for a total of about six hours in an eight hour workday; and (4) she could sit (with normal breaks) for a total of about six hours in an eight hour workday.[122] In his additional comments, Dr. Bilinsky reported that Ms. Sherwood had mild antalgic gait and generalized muscle atrophy.[123]

---

[116] R. at 374.
[117] *Id.*
[118] R. at 375.
[119] R. at 378.
[120] *Id.*
[121] R. at 379.
[122] R. at 380.
[123] R. at 386.

### 3. Mark B. Langgut, Ph.D.—State Agency Examining Psychologist

On January 26, 2007, Mark B. Langgut, Ph.D., completed a psychological assessment of Ms. Sherwood.[124] Dr. Langgut stated that Ms. Sherwood had never sought mental health treatment for her anxiety, nor did she take any medication for it.[125] Instead, she had learned coping skills.[126] Dr. Langgut also noted that Ms. Sherwood had lost approximately twenty pounds since 1997 due to stress and that she denied any history of an eating disorder.[127] Dr. Langgut stated that Ms. Sherwood did not present any signs of clinical depression and that she denied significant depressive symptoms or suicidal features.[128] However, Ms. Sherwood did report information that indicated she had generalized anxiety of mild to moderate intensity with sensations of fear, but she did not have panic features and did not express anger toward others.[129] Dr. Langgut recorded that Ms. Sherwood had mildly obsessive ideas and a mild degree of ruminative ideation as part of her personality style.[130] Dr. Langgut's final diagnostic considerations included a generalized anxiety disorder, personality disorder with obsessive-compulsive disorder (OCD) features, and anorexia.[131]

### 4. Jerrold J. Heinrich, Ph.D.—State Agency Reviewing Psychiatrist

On February 13, 2007, Jerrold J. Heinrich, Ph.D., completed a psychiatric review and mental RFC for Ms. Sherwood.[132] Dr. Heinrich indicated that Ms. Sherwood had a generalized anxiety disorder and anorexia, but that these impairments while present, did not precisely satisfy the

---

[124] R. at 387.
[125] R. at 388.
[126] *Id.*
[127] *Id.*
[128] *Id.*
[129] R. at 389.
[130] *Id.*
[131] *Id.*
[132] R. at 390–407.

diagnostic criteria in the psychiatric evaluation form.[133] Similarly, Dr. Heinrich indicated that Ms. Sherwood had a personality disorder with OCD features, but that this impairment did not precisely satisfy the diagnostic criteria in the psychiatric evaluation form.[134] Dr. Heinrich also noted that these impairments would moderately limit Ms. Sherwood's ability to maintain concentration, persistence, or pace at work.[135]

In the mental RFC, Dr. Heinrich again stated that Ms. Sherwood was moderately limited in her ability to perform activities with a schedule, maintain regular attendance, and be punctual within customary tolerances, and in her ability to maintain attention and concentration for extended periods of time.[136] Dr. Heinrich also indicated that Ms. Sherwood's ability to respond appropriately to change in the work setting was also moderately limited.[137] Dr. Heinrich concluded that Ms. Sherwood could concentrate and persist adequately on tasks within an organized setting, but that she needed to be employed in a low-stress job without tight time deadlines or high production quotas.[138]

### 5. Jennifer Jones, M.D.—Claimant's Treating Physician

On May 13, 2009, Dr. Jones completed a Multiple Impairment Questionnaire for Ms. Sherwood's disability application.[139] In this questionnaire, Dr. Jones reviewed an MRI that was completed by Biren M. Patel, M.D., on April 6, 2009.[140] Dr. Patel found that there was a broad-based disc bulge with a left foraminal disc protrusion and left facet arthorpathy, which collectively resulted in moderate left foraminal stenosis and impingement of the exiting left L4 nerve root.[141] Based on

---

[133] R. at 395.
[134] R. at 397.
[135] R. at 400.
[136] R. at 404.
[137] R. at 405.
[138] R. at 406.
[139] R. at 520.
[140] R. at 501.
[141] *Id.*

the MRI results, Dr. Patel determined that Ms. Sherwood was experiencing multilevel lumbar spondylosis, which was most prominent on her left side at L4-5 and compressed her L4 nerve root.[142]

Dr. Jones diagnosed Ms. Sherwood as having degenerative disc disease and compression of her L4 nerve root.[143] Dr. Jones also stated that Ms. Sherwood had a poor prognosis based on the fact that her pain levels had shown improvement in the six years since her initial back injury.[144] Dr. Jones rated Ms. Sherwood's pain at a level of six out of ten and her fatigue level at a four out of ten.[145] She also stated that Ms. Sherwood could not sleep for more than two hours at a time and that the resulting fatigue contributed to her pain.[146]

Additionally, in this same questionnaire, Dr. Jones stated that Ms. Sherwood could only sit for three hours and stand or walk for two hours during an eight-hour workday.[147] Dr. Jones also indicated that Ms. Sherwood would need to get up and move around every twenty-five minutes and that after standing it would take at least fifteen minutes for her to be able to sit again.[148] Based on her pain levels and need for frequent position changes, Dr. Jones concluded that Ms. Sherwood would only be capable of low work stress.[149] Dr. Jones also indicated that Ms. Sherwood would likely be absent from work more than three times a month.[150]

On January 7, 2010, Dr. Jones also completed a Psychiatric/Psychological Impairment Questionnaire for Ms. Sherwood.[151] In this questionnaire, Dr. Jones diagnosed Ms. Sherwood as

---

[142] *Id.*
[143] R. at 521.
[144] *Id.*
[145] R. at 523.
[146] *Id.*
[147] *Id.*
[148] R. at 524.
[149] R. at 526.
[150] R. at 527.
[151] R. at 529.

having anxiety and depression, and Dr. Jones further stated that Ms. Sherwood's prognosis was poor due to her inability to work and unrelenting pain.[152] Dr. Jones specifically found that Ms. Sherwood's ability to maintain attention and concentration for extended periods of time was moderately limited.[153] Dr. Jones also stated that if Ms. Sherwood did not have a "significant disability" from her back pain, her anxiety and depression would not limit her job functioning.[154] But taken together these conditions significantly limited her ability to work.[155] Dr. Jones further explained that Ms. Sherwood's anxiety and depression had worsened over the years due to her significant pain and inability to work.[156]

## D. ALJ Hearing

On April 7, 2010, ALJ David W. Thompson presided over a hearing in Peoria, Illinois.[157] Ms. Sherwood appeared with her attorney, Charles Binder.[158] Additionally, a vocational expert ("VE"), William Schweiss, also testified at this hearing by telephone.[159]

### 1. Ms. Sherwood's Testimony

At this hearing, Ms. Sherwood testified that she was divorced, had two adult children, and lived with her boyfriend in a mobile home[160] in Tonica, Illinois.[161] The only current source of income that she relied on was her boyfriend's unemployment, and she also received food stamps and utility assistance.[162] In 2003, she had collected benefits on a Workers' Compensation claim, and the

---

[152] R. at 530.
[153] R. at 533.
[154] R. at 536.
[155] Id.
[156] R. at 537.
[157] R. at 37.
[158] R. at 35.
[159] R. at 37.
[160] R. at 40.
[161] R. at 56.
[162] R. at 41.

benefits were distributed in a lump sum settlement, amounting to $120,000, and weekly benefits, which she received twice a month from 2003 until 2006.[163] After attorney fees, Ms. Sherwood received around $114,000 for her settlement.[164] She last collected unemployment in 1996, and at the time of this hearing, she did not have any form of medical insurance.[165] Ms. Sherwood stated that her highest level of education was twelfth grade.[166] She also testified that the last day that she worked was September 12, 2003.[167]

When asked by the ALJ what medications she was currently using, Ms. Sherwood responded hydrocodone, naproxen, Prozac, and Trazodone.[168] The ALJ asked who prescribed the hydrocodone to Ms. Sherwood, and she stated that Dr. Jones, her pain management doctor, had prescribed it and that Dr. Jones was considering switching this medication since it was no longer as effective as it once was.[169] She also explained that the naproxen worked "fine" and that she had recently started using Prozac.[170] Nausea was the only side effect of these medications that Ms. Sherwood mentioned during this initial questioning.[171] Also during this line of questioning, Ms. Sherwood requested the ALJ's permission to stand up for a few minutes, which he allowed.[172]

The ALJ then proceeded to describe Ms. Sherwood's behavior at a previous hearing, which took place on April 9, 2009.[173] That hearing was ultimately adjourned to allow Ms. Sherwood time to obtain representation.[174] According to the ALJ, after that hearing Ms. Sherwood left the room,

---

[163] Id.
[164] R. at 42.
[165] Id.
[166] R. at 43.
[167] Id.
[168] R. at 44.
[169] R. at 45.
[170] Id.
[171] Id.
[172] R. at 45.
[173] Id.
[174] Id.

walked outside, and stood "for quite some time."[175] The ALJ could not report the exact amount of time that he observed Ms. Sherwood standing, but again stated that it was "quite a long time."[176] The ALJ did not directly question Ms. Sherwood about this behavior or request an explanation. Without further comment from Ms. Sherwood, he transitioned to discussing Dr. Ghanayem's opinion.[177] (While answering a later question from the ALJ, Ms. Sherwood responded to these statements about her standing outside after the last hearing and explained that she had been waiting on someone from the Social Security Administration to bring her a CD).[178]

The ALJ spoke about Dr. Ghanayem's opinion, Dr. Jones' opinion, and about the results of Ms. Sherwood's FCE without posing any questions to Ms. Sherwood.[179] The ALJ stated that he found Dr. Ghanayem's assessment of Ms. Sherwood's functional limitations based on her FCE to be of "more troubling concern" as compared to her behavior at the previous hearing.[180] For example, the ALJ noted that Dr. Ghanayem assessed Ms. Sherwood as being able to lift fifteen pounds from thigh to chest on a regular basis and to sit, stand, and move throughout the course of a workday, and he determined that her stooping and bending should be limited.[181] The ALJ also referenced Dr. Ghanayem's conclusion that she was at MMI and that it would be a reasonable goal for Ms. Sherwood to work eight hours per day, five days per week.[182] During these statements, the ALJ also briefly stated that Dr. Jones had given her "very generous limitations."[183]

---

[175] *Id.*
[176] *Id.*
[177] R. at 45–46.
[178] R. at 48.
[179] R. at 46.
[180] *Id.*
[181] R. at 46.
[182] *Id.*
[183] *Id.*

Still without posing any questions, the ALJ went on to describe his impressions of the results from Ms. Sherwood's FCE.[184] The ALJ quoted portions of the results indicating that Ms. Sherwood had not put forth full effort during the testing and that the test findings in combination with clinical observations suggested a "moderate question to be drawn" regarding the reliability and accuracy of Ms. Sherwood's objective reports of her pain and limitations.[185] The ALJ told Ms. Sherwood that she had demonstrated five out of the seven positive Waddell signs during her FCE, and then he asked her if she knew what that meant.[186] When she answered that she did not, the ALJ explained that they were tests designed to see if "you're trying to pull the doctor's leg about pain."[187] The ALJ also recited other results from the FCE, including that Ms. Sherwood sat for twenty-nine minutes at a time, stood for a total of twenty-one minutes, and walked for a total of fifteen minutes.[188] The ALJ then told Ms. Sherwood that these results indicated that she had been "less than candid" with her physicians and that he needed her explanation for these results.[189] Ms. Sherwood told the ALJ that she did not have an explanation for those outcomes, that she tried her best on those tests, and that she was in bed for two days afterwards because of her back pain.[190] She explained that her pain levels vary day to day and that some days she cannot get out of bed because her "back doesn't work."[191]

The ALJ then questioned Ms. Sherwood regarding her daily activities.[192] Ms. Sherwood testified that she drove on average five miles a week and that she was able to take care of her

---

[184] *Id.*
[185] *Id.*
[186] R. at 47.
[187] *Id.*
[188] *Id.*
[189] *Id.*
[190] R. at 48.
[191] *Id.*
[192] R. at 49.

personal hygiene "ninety-nine percent of the time."[193] Ms. Sherwood's attorney did not object to any of the ALJ's questions for Ms. Sherwood.[194]

After the ALJ finished questioning Ms. Sherwood, Mr. Binder proceeded to question Ms. Sherwood.[195] Mr. Binder asked Ms. Sherwood how long she could stand for, and Ms. Sherwood stated that on a good day she could stand for half an hour depending on the type of surface that she was standing on.[196] Ms. Sherwood also described the pain she experienced when standing for longer than thirty minutes as shooting pain from the middle of her back to left hip and into her legs.[197] To relieve the pain, Ms. Sherwood stated that she would sit down, typically in a reclining position for around fifteen to twenty minutes.[198] Mr. Binder then asked Ms. Sherwood how long she could sit, and she replied that she could sit in one position for around half an hour and then she would have to get up and walk around.[199]

Mr. Binder also asked Ms. Sherwood about the side effects caused by her medications, and in addition to nausea, she stated that her medications caused her to lose weight, have migraine headaches, and experience sleeplessness.[200] Ms. Sherwood also testified that these medications limited her daily activities in the sense that she could not drive or go anywhere while the medicines were "setting in" and that she experienced dizziness if she tried to move around soon after taking these medications.[201]

---

[193] *Id.*
[194] R. at 37–49.
[195] R. at 49.
[196] *Id.*
[197] *Id.*
[198] *Id.*
[199] R. at 49–50.
[200] R. at 50.
[201] R. at 50.

Mr. Binder also asked about Ms. Sherwood about her medical care providers.[202] Ms. Sherwood testified that she had been seeing Dr. Jones as her primary care giver since 2004, after Ms. Sherwood's Workers' Compensation benefits ended.[203] She then confirmed that the other doctors included in the record were associated with her Workers' Compensation claim and that they were referred to her by Dr. DePhillips.[204] Mr. Binder also mentioned Dr. Ghanayem's recommendation in 2006 that Ms. Sherwood undergo another surgery, and Ms. Sherwood responded that without medical coverage, she could not have this surgery.[205]

Lastly, Mr. Binder asked Ms. Sherwood to describe her pain.[206] She explained that the pain extended from the middle of her lower back down into her left leg.[207] Regarding the intensity of the pain, Ms. Sherwood stated that without medication her pain would be well over a ten on a scale of one to ten.[208] The pain also caused sleeping difficulties, and Ms. Sherwood reported that generally she could only sleep three hours a night.[209] Ms. Sherwood stated that her most comfortable position to maintain for any given time was being partially reclined.[210]

The ALJ then questioned Ms. Sherwood again about the intensity of her pain over the years since her 2003 accident using a one to ten scale, with one being no pain and ten being the most "excruciating pain imaginable."[211] Ms. Sherwood explained that her pain had increased over the

---

[202] *Id.*
[203] *Id.* The ALJ asked Ms. Sherwood, "[H]ow long have you been with Dr. Jones approximately?" and Ms. Sherwood responded, "Since 2004." R. at 50. Ms. Sherwood clarified, "I started going to her [Dr. Jones] directly to her when all the other doctors after Workmans' Comp[ensation] was over with, I started to her." R. at 50. However, in Dr. Jones' Multiple Impairment Questionnaire, Dr. Jones stated that she first treated Ms. Sherwood in October of 2003. R. at 521.
[204] R. at 50.
[205] R. at 51.
[206] *Id.*
[207] *Id.*
[208] R. at 52.
[209] *Id.*
[210] *Id.*
[211] R. at 53.

years and that currently her average pain level was around a six; she further described that on a good day, her pain was a five, and on a bad day, her pain would be an eight or nine.[212] She also stated that she only had about five good days in a typical month.[213] Ms. Sherwood's attorney interjected during this line of questioning and asked Ms. Sherwood what her level of pain would be without medication.[214] Ms. Sherwood stated that without medication, even on a good day, her pain would be an eight.[215] At the close of her testimony, Ms. Sherwood stated that as long as she "take[s] it easy," her pain will be milder.[216] She also offered two additional examples of her daily activities, stating: (1) that if she vacuumed, she could not vacuum the whole house and (2) that recently she had planted flowers in her garden, but was in extreme pain afterwards.[217]

## 2. VE Testimony

After the examination of Ms. Sherwood concluded, the ALJ questioned the VE.[218] The VE requested clarifying information from Ms. Sherwood regarding the nature of her position at Brownie.[219] Ms. Sherwood explained that, as a part of that job, she packaged crackers for Oscar Mayer Lunchables, which required that she bag crackers that came down the conveyor belt, put the bags into a box, and then carry the box over to another conveyor belt.[220] Ms. Sherwood then clarified that while working at Brownie, she was assigned sanitation tasks because she was working too slow on the conveyor belt.[221] Her sanitation position entailed mopping the bathrooms, cleaning buckets,

---

[212] *Id.*
[213] *Id.*
[214] *Id.*
[215] *Id.*
[216] R. at 55.
[217] *Id.*
[218] *Id.*
[219] R. at 56.
[220] R. at 57.
[221] R. at 58.

and hauling empty flour bags.[222] She also stated that she was never in a supervisory role at Brownie.[223]

After clarifying the tasks associated with Ms. Sherwood's past roles, the ALJ proceeded to present the VE with two hypothetical situations to determine whether with Ms. Sherwood's RFC, she could still work.[224] In the first hypothetical, the ALJ asked the VE to consider an individual with the same age, education, and experience as Ms. Sherwood, who was limited to light work, less complex work, and jobs with lower stress.[225] The VE was then asked to explain the effect of those facts on the performance of Ms. Sherwood's past relevant work.[226] The VE stated that those circumstances would eliminate Ms. Sherwood's previous meat wrapper position and her previous janitorial job at Brownie.[227] In the VE's opinion, the sanitation and meat wrapper roles would have been in the heavier range of work, which she would no longer be able to perform.[228] The VE also stated that Ms. Sherwood would no longer be able to work as a semi-truck driver.[229] Lastly, the ALJ identified Ms. Sherwood's bus driver position as her only previous employment that did not involve lifting.[230]

In his second hypothetical, the ALJ asked the VE to consider an individual of the same age, education, and experience as Ms. Sherwood, who was limited to sedentary work with a sit/stand option and to positions with little change in the job process and with only average production

---

[222] Id.
[223] R. at 59.
[224] R. at 60.
[225] Id.
[226] Id.
[227] Id.
[228] R. at 61.
[229] Id.
[230] R. at 62.

quotas.[231] The ALJ asked the VE to consider those parameters and determine the effect on the performance of Ms. Sherwood's past relevant work.[232] The VE responded that based on those attributes and limitations that he would rule out all of Ms. Sherwood's past relevant work.[233] The ALJ then asked if there would be other jobs in the economy that an individual with those attributes and limitations could perform.[234] The VE responded that this individual could likely perform assembly or packaging positions, information clerk positions, receptionist positions, and cashier positions.[235] The ALJ then asked the VE about the availability of these jobs, and the VE stated that there are about 2,000-3,000 assembly jobs, 2,000 packaging jobs, and 5,000 receptionist positions in Illinois.[236] The VE could not identify how many information clerk positions there were in Illinois.[237]

The ALJ then presented two additional hypothetical conditions to the VE.[238] First, the ALJ asked the VE to consider a person who could lift up to fifteen pounds regularly, ten pounds overhead, occasional postural activities, but could not use ropes, ladders, or scaffolds.[239] The VE responded that the school bus driver position would still be allowed under those conditions.[240] Next, the ALJ asked how missing four or more days of work per month would affect an individual's employability in the previously discussed positions.[241] The VE stated that missing four days or more a month would eliminate all competitive full-time jobs.[242]

---

[231] R. at 62.
[232] R. at 63.
[233] *Id.*
[234] *Id.*
[235] *Id.*
[236] *Id.*
[237] R. at 64.
[238] *Id.*
[239] *Id.*
[240] *Id.*
[241] R. at 64.
[242] *Id.*

Mr. Binder then asked the VE to consider if a person needed more than three thirty minute, unscheduled breaks a day in addition to any breaks that are normally offered to the employee.[243] The VE stated that this condition would eliminate all full-time competitive work.[244]

**E. ALJ Decision**

On May 13, 2010, the ALJ rendered a decision finding that Ms. Sherwood was not disabled within the meaning of the Social Security Act.[245] In determining whether Ms. Sherwood suffered from a disability, the ALJ described and conducted the standard five-step inquiry outlined in the Regulations.[246]

Under this five-step inquiry, the ALJ must determine: (1) whether the applicant is currently unemployed; (2) if so, whether the medical severity of the applicant's impairment or combination of the applicant's impairments has lasted for twelve months; (3) whether the applicant's impairments or impairments are listed by the Social Security Administration as being so severe as to prevent the applicant from performing basic work-related activities; (4) if not, whether the applicant retains the RFC to perform past relevant work; and (5) if not, whether the applicant can adjust to other work considering an assessment of the applicant's RFC and the applicant's age, education, and work experience.[247] When applying this five-step test, if the ALJ finds at any step, except Step 3, that the applicant is not disabled, a final decision is made and the analysis is concluded.[248]

Initially, the ALJ found that Ms. Sherwood last met the insured status requirements of the Social Security Act on December 31, 2008.[249] At step one, the ALJ found that Ms. Sherwood did not

---

[243] R. at 65.
[244] *Id.*
[245] R. at 18.
[246] R. at 19–20, 24–29.
[247] 20 C.F.R. § 404.1520(a)(4)(i)-(v); *Barnhart v. Thomas*, 540 U.S. 20, 24–25 (2003).
[248] 20 C.F.R. § 404.1520(a)(4).
[249] R. at 24.

engage in substantial gainful activity during the period from her alleged injury on September 12, 2003 through her date last insured of December 31, 2008.[250]

At step two, the ALJ determined that Ms. Sherwood had two severe impediments, degenerative disc disease and depression, which significantly limited her ability to perform basic work activities.[251] Ms. Sherwood had also claimed that she was disabled, in part, because of her OCD, anxiety, and personality disorder.[252] The ALJ concluded that there was no objective evidence that Ms. Sherwood's OCD, anxiety, or personality disorder resulted in any functional restrictions based on her testimony and on the fact that she never had any psychiatric hospitalizations or any treatment with a psychiatrist, psychologist, or other mental health professional.[253] Consequently, the ALJ found these conditions to be non-severe.[254]

At step three, the ALJ determined that Ms. Sherwood did not have an impairment or combination of impairments that met or medically equaled a listed impairment in 20 C.F.R. § 404, Subpart P, Appendix 1.[255] The ALJ concluded that Ms. Sherwood's degenerative disc disease did not meet or equal the disorders of the spine in Listing 1.04 because it had not resulted in the requisite compromise of a nerve root or the spinal cord.[256]

Additionally, the ALJ determined that Ms. Sherwood's mental impairment did not meet or medically equal the criteria in Listing 12.04.[257] To reach this conclusion, the ALJ reviewed "paragraph B" criteria and "paragraph C" criteria in the Regulations to see if Ms. Sherwood met the

---

[250] *Id.*
[251] *Id.*
[252] *Id.*
[253] *Id.*
[254] *Id.*
[255] *Id.*
[256] *Id.*
[257] R. at 24.

listings.[258] Under "paragraph B" criteria, the mental impairment must result in at least two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration.[259] Within this section, "marked" means more than moderate, but less than extreme.[260] Also, "repeated episodes of decompensation, each of extended duration" is defined as either three episodes within one year or an average of once every four months, each lasting for at least two weeks.[261]

In this case, analyzing the "paragraph B" criteria, the ALJ found that Ms. Sherwood's depression caused only mild restriction in her daily living and mild difficulties in her social functioning.[262] This determination was based on Ms. Sherwood's testimony that her daily activities were limited due to physical pain, rather than her mental condition, and that she had no difficulty with social interaction.[263] The ALJ did determine that Ms. Sherwood had moderate difficulties with concentration because of her physical pain and the side effects from her medication.[264] Furthermore, the ALJ acknowledged that Ms. Sherwood had experienced no episodes of decompensation or any psychiatric hospitalizations and had not been treated by a mental health professional.[265] Ultimately, the ALJ found that Ms. Sherwood's mental impairments did not cause at least two "marked" limitations or one "marked" limitation and "repeated" episodes of decompensation and, therefore, the "paragraph B" criteria were not satisfied.[266]

---

[258] *Id.*
[259] 20 C.F.R. § 404, Subpt. P, App. 1; 20 C.F.R. §§ 416.925, 416.926; R. at 24.
[260] 20 C.F.R. § 404, Subpt. P, App. 1; R. at 24.
[261] 20 C.F.R. § 404, Subpt. P, App. 1; R. at 24.
[262] R. at 24.
[263] *Id.*
[264] *Id.*
[265] R. at 25.
[266] R. at 25.

The ALJ also considered the requirements posed under "paragraph C" criteria, and found that in Ms. Sherwood's case, the evidence presented failed to establish the existence of "paragraph C" criteria.[267] To satisfy "paragraph C" criteria, the claimant must have a medically documented history of a chronic affective disorder, lasting at least two years, which has caused more than a minimal limitation of ability to do basic work activities along with one of the following: repeated episodes of decompensation, each of extended duration; or a residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or a current history of one or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.[268]

In this case, the ALJ found that Ms. Sherwood had experienced no episodes of decompensation and that her depression had not resulted in a marginal adjustment.[269] Thus, the "paragraph C" criteria were not satisfied.

If an ALJ determines that no impairments meet SSA listing requirement, the ALJ will proceed to the fourth step of the test to determine the claimant's RFC, which indicates whether the claimant is able to perform his past relevant work.[270] A claimant's RFC will represent what work a claimant can perform despite his or her physical or mental limitations.[271] To evaluate Ms. Sherwood's RFC, the ALJ followed a two-step process, which requires first that an ALJ consider whether there was an underlying medically determinable physical or mental impairment that could

---

[267] *Id*.
[268] *Id*.
[269] *Id*. The ALJ further explained that Ms. Sherwood's depression had not cause a marginal adjustment, which given a slight increase in mental demands or environmental change could have caused her to decompensate. *Id*.
[270] 20 C.F.R. § 404.1520(a)(4)(iv).
[271] 20 C.F.R. § 416.945; R. at 26.

reasonably be expected to produce a claimant's pain.[272] If an underlying physical or mental impairment has been established, the ALJ must evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to ascertain the extent to which these symptoms limit the claimant's functioning.[273] When making determinations about the credibility of the claimant's subjective complaints, the ALJ must consider the entire record.[274] Additionally, the ALJ only has to consider subjective symptoms to the extent that they can reasonably be accepted as consistent with the objective medical evidence and other evidence available in the record.[275] After this analysis, if the ALJ determines that the claimant's RFC allows her to perform her past work, the claimant will not be found disabled.[276]

In this case, the ALJ found that Ms. Sherwood had the RFC to perform light work, with some exceptions, through the date when she was last insured.[277] The ALJ recognized that the medical records indicated continuing complaints of back pain.[278] The ALJ considered evidence that Ms. Sherwood had undergone a lumbar hemilaminotomy and discectomy at right L2-3, decompression of cauda equine, and right L3 foraminotomy.[279] The ALJ stated Ms. Sherwood's post-operative diagnosis was right-sided disc herniation at L2-3 with severe spinal stenosis and cauda equina compression.[280] The ALJ also considered Dr. Ghanayem's recommendation for further surgery in 2006 and that this was still his current recommendation.[281] The ALJ then noted Ms. Sherwood's

---

[272] 20 C.F.R. § 404.1529; R. at 26.
[273] 20 C.F.R. § 404.1529(c); R. at 26.
[274] 20 C.F.R. § 404.1529(c)(4).
[275] *Id.*
[276] *Id.*
[277] R. at 26.
[278] *Id*.
[279] *Id*.
[280] R. at 27.
[281] R. at 27.

testimony that she could only stand for thirty minutes on a "good day" depending on the surface and that her pain is generally between a five to eight on a scale of ten, but without medication it would be well over a ten.[282] The ALJ's opinion also referenced some of Ms. Sherwood's daily activities including: independently attending to her personal hygiene, some vacuuming, and occasional gardening.[283]

Based on this evidence, the ALJ found that Ms. Sherwood's medically determinable impairments could reasonably be expected to cause the alleged symptoms.[284] However, the ALJ determined that Ms. Sherwood's statements concerning the intensity, persistence, and limiting effects of these symptoms were not credible to the extent that they were inconsistent with the RFC assessment.[285]

The ALJ stated that Ms. Sherwood was "severely lacking in credibility" and cited the report from her FCE, which classified her efforts as being sub-optimal.[286] More specifically, the ALJ's opinion stated that Ms. Sherwood had five of seven positive Waddell signs and that two of the five questions on the Waddell Inappropriate Symptom Questionnaire indicated inappropriate illness behavior.[287]

The ALJ also relied on Dr. Ghanayem's analysis of Ms. Sherwood's functional limitations, which indicated that she could lift fifteen pounds from her thighs to chest on a regular basis and that she was able to sit, stand, and move around during the course of a workday.[288] The ALJ also cited

---

[282] R. at 26–27.
[283] *Id.*
[284] R. at 27.
[285] *Id.*
[286] *Id.*
[287] *Id.*
[288] R. at 27.

to Dr. Ghanayem's opinion that considering Ms. Sherwood at maximum medical improvement, working eight hours a day, five days a week was a reasonable target for Ms. Sherwood.[289]

After describing Dr. Ghanayem's opinion, the ALJ went on to discuss his observations of Ms. Sherwood during her first hearing.[290] The ALJ stated that he observed Ms. Sherwood walk out into the parking lot and stand there "for quite some time" talking to friends.[291] The ALJ noted that when Ms. Sherwood was confronted with the inconsistencies in the record, she did not have an explanation and that in a defiant tone, she claimed that she was in bed for two days after the FCE because of her back pain.[292]

Ultimately, the ALJ found that the objective diagnostic results in the medical records were all fairly mild and not in keeping with the level of pain that Ms. Sherwood claimed.[293] Since the ALJ found Ms. Sherwood less than fully credible, he reasoned that he could not conclude that Ms. Sherwood was entirely disabled under the Guidelines.[294]

The ALJ then proceeded to discuss the opinion of Ms. Sherwood's primary physician, Dr. Jones.[295] The ALJ did not consider Dr. Jones' opinion to be persuasive for several reasons.[296] The ALJ stated Dr. Jones' opinion was "without substantial support from, and contrast[ed] sharply with, the other evidence of record, particularly the consistent opinions of all other medical reports," and this "obviously" rendered her opinion less persuasive.[297]

---

[289] *Id.*
[290] R. at 28.
[291] *Id.*
[292] *Id.*
[293] *Id.*
[294] *Id.*
[295] *Id.*
[296] *Id.*
[297] *Id.*

Additionally, the ALJ inferred from the documentation submitted by Dr. Jones that she had heavily relied on Ms. Sherwood's subjective reports of symptoms and limitations and, furthermore, that Dr. Jones appeared to uncritically accept most, if not all, of Ms. Sherwood's reports to be true.[298] Then, based on the ALJ's determination that Ms. Sherwood was not credible, he reasoned that Ms. Sherwood's allegations to Dr. Jones were unreliable and, therefore, that any medical opinion based on her subjective statements were equally lacking in credibility.[299]

In discrediting Dr. Jones' opinion, the ALJ also stated that in her reports, Dr. Jones was assessing an area outside of her area of expertise.[300] Moreover, the ALJ questioned Dr. Jones' statement that Ms. Sherwood was disabled because it was not clear that Dr. Jones was familiar with the definition of "disability" under the Social Security Act.[301]

The ALJ also mentioned that it was possible that a doctor could express an opinion in order to assist a patient out of sympathy and that in some cases, patients could be quite demanding in their pursuit of support notes or reports from their doctors.[302] The ALJ admitted that it would be difficult to confirm the existence of these motives, but then he stated that those motives are more likely to exist in situations where the opinion in question departs substantially from the rest of the evidence in the record, as in Ms. Sherwood's case.[303] Additionally, the ALJ reasoned that Dr. Jones' opinion was even less persuasive because it had been rendered at the request of Ms. Sherwood's attorney.[304]

---

[298] R. at 28.
[299] *Id.*
[300] *Id.*
[301] *Id.*
[302] *Id.*
[303] *Id.*
[304] R. at 28.

Based on these reasons, the ALJ concluded that Dr. Jones' opinion was not persuasive and thus did not assign it controlling weight.[305]

The ALJ found that due to her degenerative disc disease, Ms. Sherwood was limited to light work and that due to her depression, she was limited to less than complex tasks with lower levels of stress and without tight time deadlines or high production quotas.[306] The ALJ concluded that Ms. Sherwood was capable of performing past relevant work as a school bus driver and packager, and that this work would be appropriate based on her RFC.[307] The ALJ briefly mentioned the testimony of the VE, including that the VE had found that an individual with Ms. Sherwood's RFC could perform the requirements of Ms. Sherwood's past relevant work, as a school bus driver and hand packager.[308] Based on the VE's testimony and a comparison of Ms. Sherwood's RFC with the demands of this work, the ALJ found that Ms. Sherwood was able to perform this work.[309]

## III.    STANDARD OF REVIEW

This court performs a *de novo* review of the ALJ's conclusions of law, but grants deference to the ALJ's factual findings.[310] An ALJ's decision will be upheld if substantial evidence supports the findings of the decision and if those findings are free of legal error.[311] Additionally, if reasonable minds could differ as to a disability determination based on this evidence, this court must affirm the ALJ, assuming his or her decision is adequately supported.[312] The ALJ is responsible for building an accurate and logical bridge from the evidence to his or her conclusion.[313] In doing so, an ALJ

---

[305] *Id.*
[306] *Id.*
[307] R. at 29.
[308] *Id.*
[309] *Id.*
[310] *Prochaska v. Barnhart,* 454 F.3d 731, 734 (7th Cir. 2002).
[311] *Steele v. Barnhart,* 290 F.3d 936, 940 (7th Cir. 2002) (citing to 42 U.S.C. § 405(g)).
[312] *Cass v. Shalala,* 8 F.3d 552, 555 (7th Cir. 1993).
[313] *Dixon v. Massanari,* 270 F.3d 1171, 1176 (7th Cir. 2001).

must consider all relevant evidence in determining whether an applicant is disabled.[314] Although, the ALJ need not discuss every piece of evidence, he must minimally articulate his or her reasons for crediting or discrediting evidence of disability.[315] The court will conduct a critical review of the evidence in the record, and an ALJ's decision will not be upheld if it lacks evidentiary support or an adequate discussion of the issues.[316]

## IV.    ANALYSIS

In her request for review, Ms. Sherwood has stated three main issues: (1) the ALJ's credibility determination was based on false premises and violated due process; (2) the ALJ erred in disregarding the viewpoint of the treating physician; and (3) the ALJ erred in his determination of Ms. Sherwood's RFC.[317] While this opinion will discuss each of her claims, we find that ultimately this case must be remanded to the SSA because the ALJ's decision does not demonstrate that the ALJ examined the full range of medical evidence related to this claim.[318]

## A.    The Credibility Determination

Ms. Sherwood argues that the ALJ made credibility determinations based on "false premises" that were inconsistent with due process.[319] The Commissioner responds that the ALJ reasonably determined that Sherwood lacked credibility and, more specifically, asserts that the ALJ properly

---

[314] *Herron v. Shalala,* 19 F.3d 329, 333 (7th Cir. 1994) (explaining that an ALJ cannot consider and discuss only the evidence that supports his ultimate conclusion).
[315] *Clifford v. Apfel,* 227 F.3d 863, 870 (7th Cir. 2000).
[316] *Clifford*, 227 F.3d  at 869.
[317] Pl. Memo. at 11, 14, dkt. 21.
[318] *Zurawski v. Halter*, 245 F.3d 881, 888 (7th Cir. 2001).
[319] Pl. Mem. at 11–12, dkt. 21.

supported his credibility determination and that the ALJ did not violate Ms. Sherwood's right to due process.[320]

Special deference is given to a hearing officer's credibility determination because he or she is in the best position to see and hear the witnesses and assess their forthrightness.[321] Generally, an ALJ's credibility determinations will not be overturned unless they were "patently wrong."[322] Lastly, while a hearing officer may not reject subjective complaints of pain solely because they are not supported by medical evidence, the officer may consider this conflict as probative of the claimant's credibility.[323]

In this case, the ALJ discredited Ms. Sherwood's credibility to the extent that her complaints of pain were inconsistent with his RFC assessment.[324] The ALJ cited Ms. Sherwood's results from the FCE indicating that she had five of seven positive Waddell signs and that two of five questions from the Waddell Inappropriate Symptom Questionnaire indicated inappropriate illness behavior.[325] The ALJ also referenced Dr. Ghanayem's opinion from 2004 that she was at MMI and reasonably could work eight hours a day, five days a week.[326]

Additionally, the ALJ referenced at length the incident at the previous hearing when Ms. Sherwood had stood in the parking lot "for quite some time."[327] Ms. Sherwood argues that this consideration violated her due process rights. The Commissioner responds that there was no due process violation and that the ALJ provided Ms. Sherwood with the opportunity to explain her

---

[320] Def. Mem. at 6–10, dkt. 27.
[321] *Nelson v. Apfel,* 131 F.3d 1228, 1237 (7th Cir. 1997).
[322] *Powers v. Apfel,* 207 F.3d 431, 435 (7th Cir. 2000).
[323] *Powers*, 207 F.3d at 435.
[324] R. at 27.
[325] *Id.*
[326] *Id.*
[327] R. at 28.

behavior.[328] The Seventh Circuit has expressed discomfort with this type of evidence based on the claimant's behavior because it can be so easily manipulated, but it has also endorsed the validity of a hearing officer's observations of the claimant.[329] Moreover, this Circuit has repeatedly endorsed the role of observation in determining credibility.[330] A hearing officer has the opportunity to observe the claimant for an extended period of time and to gauge whether the claimant's demeanor, behavior, attitude, and other characteristics suggest frankness and honesty.[331] Consequently, it would not be "patently wrong" for the ALJ to consider Ms. Sherwood standing outside the hearing as one of several factors included in his credibility determination.[332]

However, when the ALJ considers different factors related to credibility, evidence that is both favorable and unfavorable to the claimant must be examined.[333] In this case, the ALJ has based his decision to discredit Ms. Sherwood's credibility on the following: (1) the Waddell results from her FCE, (2) Dr. Ghanayem's opinion, and (3) his observations of Ms. Sherwood after the 2009 hearing.[334] The only reference made to other available medical evidence during this credibility discussion was the ALJ's statement that, "[t]he objective diagnostic results in the medical records are all fairly mild and are not in keeping with the level of pain the claimant alleges."[335] The medical

[328] Def. Mem. at 9, dkt. 27. The Commissioner cited to *Nelson*, 131 F.3d 1228 (7th Cir. 1997) (finding that it was improper for the ALJ to consider evidence outside the record in determining the extent of the claimant's disability, but also finding that this error was harmless since the ALJ considered other evidence in the record).

[329] *Powers*, 207 F.3d at 436 (citing to *Marbury v. Sullivan*, 957 F.2d 837, 839 (11th Cir. 1992); *Miller v. Sullivan*, 953 F.2d 417, 422 (8th Cir. 1992); *Lovejoy v. Heckler*, 790 F.2d 1114, 1116 (4th Cir. 1986)).

[330] *Powers,* 207 F.3d at 436 (citing to *Dray v. Railroad Retirement Bd.*, 10 F.3d 1306, 1314 (7th Cir. 1993); *Erhart v. Secretary of Health & Human Servs.*, 969 F.2d 534, 541 (7th Cir. 1992); *Strunk v. Heckler*, 732 F.2d 1357, 1362 (7th Cir. 1984)).

[331] *Powers*, 207 F.3d at 436.

[332] *Id.* (upholding a hearing officer's decision to discredit a claimant's credibility based in part on the contradiction between her statement that she could not sit for more than ten minutes and her behavior during the hearing where she sat without discomfort for more than ten minutes).

[333] *Bauzo v. Bowen*, 803 F.2d 917, 923 (7th Cir. 1986).

[334] R. at 27–28.

[335] R. at 28.

records for this case stretch over a span of seven years and contain the opinions of over fifteen different physicians, including multiple opinions that are more recent than the FCE results and Dr. Ghanayem's opinion, which were both based on information gathered in 2004.[336] In analyzing inconsistencies between a claimant's statements and medical evidence, an ALJ must investigate "all avenues" presented that relate to pain, including the observations by treating and examining physicians.[337]

Ultimately, we are unable to determine whether the ALJ investigated "all avenues" related to Ms. Sherwood's complaints of pain because it is unclear whether the ALJ examined the full range of medical evidence related to this case.[338] Thus, we do not find the ALJ's credibility determination to necessarily be incorrect but, rather, more explanation is needed.[339] Finally, when reevaluating Ms. Sherwood's credibility, the ALJ should consider her complaints of pain in the context of the full range of medical evidence available.[340]

## B. Discrediting the Viewpoint of Treating Physician

Ms. Sherwood argues that the ALJ erred in disregarding the viewpoint of her treating physician, Dr. Jones.[341] The Commissioner responds that the ALJ reasonably weighed the medical

---

[336] R. at 28.
[337] *Luna v. Shalala*, 22 F.3d 687, 691 (7th Cir. 1994).
[338] *Zurawski*, 245 F.3d at 888; R. at 27–28.
[339] *Zurawski*, 245 F.3d at 888; R. at 27–28.
[340] *Zurawski,* 245 F.3d at 888; R. at 27–28.
[341] Pl. Mem. at 14, dkt. 21.

evidence in the record.[342] The Commissioner argues that the ALJ appropriately addressed the opinion evidence and that his decision reasonably sets out the path of his reasoning.[343]

Generally more weight is given to the opinions of the claimant's treating physician.[344] However, a treating physician's opinion will only be given controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the medical record."[345] However, the ALJ will determine which treating and examining doctors' opinions should receive weight in a Social Security DIB case, and in doing so, he must explain the reasons for his finding.[346] If the ALJ decides not assign this weight to the treating physician, he will consider factors such as the length of treatment, nature of treatment, supportability, consistency, specialization, and additional factors to determine how much weight to allocate to the opinion of each physician.[347] Internal inconsistencies may provide a permissible reason to deny controlling weight to a treating physician's opinion,[348] but the ALJ must articulate why particular statements or reports are necessarily inconsistent.[349] In other words, this Court does not require a written evaluation of every piece of evidence, but an ALJ must sufficiently articulate his assessment of the evidence to create a traceable path of reasoning and to provide assurance that he considered the important evidence.[350]

---

[342] Def. Mem. at 3–4, dkt. 27.
[343] *Id.*
[344] 20 C.F.R. § 404.1527(c).
[345] *Hofslien v. Barnhart*, 439 F.3d 375, 376 (7th Cir. 2006).
[346] 20 C.F.R. § 404.1527(d), (f), 416.927(d), (f); *Craft v. Astrue*, 539 F.3d 668, 678 (7th Cir. 2008).
[347] 20 C.F.R. § 404.1527(c).
[348] *Knight v. Chater*, 55 F.3d 309, 313 (7th Cir. 1995).
[349] *Clifford*, 227 F.3d at 871 (explaining that in order to adequately articulate his reasoning for discounting a treating physician's opinion, the ALJ must explain why the treating physician's statements were inconsistent with others in the record).
[350] *Rohan v. Chater,* 98 F.3d 966, 971 (7th Cir. 1996) (citing to *Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993)).

In Ms. Sherwood's case, the ALJ did not find the opinion Dr. Jones, Ms. Sherwood's primary physician, to be persuasive.[351] The first reason that the ALJ stated for this conclusion was that Dr. Jones' opinion was without substantial support from and "contrast[ed] sharply" with the other medical evidence in the record, "particularly the consistent opinions of *all* other medical reports."[352] The ALJ provided no specific basis for this conclusion and cited no other reports in the record when making this assertion.[353] Beyond this statement, the ALJ did not describe how Dr. Jones' opinion was inconsistent with all other reports in the record, nor did he explain how all the other reports were consistent with each other.[354] The Commissioner described the consistency between the opinions of Dr. Ghanayem, the consultative examiners, and the state agency reviewing physician to explain the ALJ's conclusion that Dr. Jones' opinion contrasted with other consistent opinions in the record, but this type of explanation was not included in the ALJ's decision.[355] Even if evidence exists in the record to support an ALJ's decision, this Court cannot uphold a decision if the rationale offered by the trier of fact does not build an accurate and logical bridge between the evidence and the result.[356]

While the ALJ need not discuss every piece of evidence,[357] the ALJ should consider all of the relevant evidence available to determine whether or not the claimant is disabled.[358] The only doctors specifically mentioned within the ALJ's opinion were Dr. Jones and Dr. Ghanayem.[359]

---

[351] R. at 28.
[352] *Id.* (emphasis added).
[353] R. at 28.
[354] *Id*.
[355] Def. Mem. at 5, dkt. 27; R. at 28.
[356] *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996).
[357] *Clifford*, 227 F.3d at 1176.
[358] *Herron*, 19 F.3d at 333 (stating that the ALJ cannot select and discuss only the evidence that favors his ultimate conclusion).
[359] R. at 24–29.

Again, there are medical records spanning seven years for this case and information contributed by *sixteen* different medical professionals. Other than Dr. Ghanayem, who reported in 2004, and Dr. Jones, the ALJ makes no specific reference to these reports or their authors.[360] Moreover, in referencing Dr. Ghanayem's opinion, the ALJ relies on statements made in 2004 without any reference to Dr. Ghanayem's 2006 recommendation that Ms. Sherwood undergo another back surgery.[361]

The second reason behind the ALJ's decision to disregard Dr. Jones' opinion is that she relied quite heavily on the subjective report of symptoms and limitations provided by Ms. Sherwood.[362] The Seventh Circuit has explained that if the treating physician's opinion is based solely on the patient's subjective complaints, the ALJ may discount it.[363] Similarly, medical opinions relied upon in an ALJ's decision should not merely recite the claimant's subjective complaints.[364] However, in this case, evidence in the record from Dr. Jones included multiple reports and questionnaires, with attached diagnostic test results,[365] which contained objective information about Ms. Sherwood's condition, not solely her subjective reports of pain and limitation.[366] Moreover, the ALJ made this assertion without adequately articulating his reasoning.[367] Instead of describing portions of Dr. Jones' report that indicate her reliance on Ms. Sherwood's subjective reports or otherwise explaining how he made this inference, the ALJ proceeded to readdress Ms. Sherwood's questionable credibility.[368] The ALJ restated information relating to his earlier credibility

---

[360] R. at 27–29.
[361] R. at 27–28; 326.
[362] R. at 28.
[363] *Ketelboeter v. Astrue*, 550 F.3d 620, 625 (7th Cir. 2008).
[364] *Rice v. Barnhart*, 384 F.3d 363, 371 (7th Cir. 2004).
[365] R. at 522.
[366] R. at 520–96.
[367] R. at 28.
[368] *Id.*

determination of Ms. Sherwood, specifically citing her substandard effort in evaluations and her positive Waddell signs, and then reasoned that any medical opinion based on Ms. Sherwood's subjective statements would be equally lacking in credibility.[369]

Another reason posited by the ALJ for not giving controlling weight to Dr. Jones' opinion is that her opinion rested upon an assessment of impairments outside the doctor's area of expertise.[370] It is unclear whether the ALJ meant that Ms. Sherwood's symptoms were outside Dr. Jones' area of expertise or if disability assessments were outside Dr. Jones' area of expertise.[371] If the ALJ intended to indicate that Ms. Sherwood's medical condition was outside of Dr. Jones' area of expertise, this could be a reason to discredit her opinion.[372] But without more explanation, the ALJ's reasoning for this determination remains unclear.[373] At the hearing, Ms. Sherwood explained to the ALJ that Dr. Jones was her pain management physician,[374] and the record reflects that Dr. Jones submitted reports detailing her impressions of Ms. Sherwood's mental[375] and physical health.[376] Aside from stating that Dr. Jones was addressing impairments outside her area of expertise, the ALJ did not clarify which impairments he was referencing or indicate how these impairments were outside of Dr. Jones' area of expertise.[377]

Dr. Jones' unfamiliarity with the Social Security Act and Regulations is another potential explanation for the ALJ's decision to discredit Dr. Jones.[378] Since the issue of whether or not Ms.

---

[369] *Id.*
[370] *Id.*
[371] R. at 28.
[372] 20 C.F.R. § 404.1527 (explaining that only when the treating source's opinion is not given controlling weight will specialization be a considered factor).
[373] R. at 28.
[374] R. at 48.
[375] R. at 559.
[376] R. at 521.
[377] R. at 28.
[378] *Id.*

Sherwood was disabled is reserved to the Commissioner, the ALJ was correct to discount Dr. Jones' determination that Ms. Sherwood was "disabled."[379] However, the ALJ still did not adequately explain his reasoning as to how making this assertion—that Ms. Sherwood was "disabled"—contributed to making Dr. Jones' opinion unpersuasive.[380]

Lastly, the ALJ explained that there was always the possibility that a doctor could express an opinion in an effort to assist a patient with whom she sympathizes.[381] The ALJ further stated that patients could also be quite demanding in their pursuit of supportive notes or reports from their physicians.[382] While concerns that a patient's regular physician may want to do a favor for a patient by finding a disability valid,[383] the ALJ is also able to decide which physician to believe, subject only to the requirement that his decision be supported by substantial evidence.[384] Thus, the ALJ in this case was free to disregard Dr. Jones' opinion on the basis that she may be biased, if he could support that decision with substantial evidence.[385] But an ALJ's conjecture is not a permitted basis for dismissing a primary physician's opinion.[386] The ALJ's reasoning that Dr. Jones' opinion was unreliable appeared to be based in part on his speculation that Dr. Jones could be trying to assist Ms. Sherwood in obtaining disability benefits or that Ms. Sherwood was demanding a helpful opinion from Dr. Jones.[387] The "searching inquiry" set forth in 20 C.F.R. § 404.1527(d)(2) aims to address this type of concern regarding the relationship between treating physician and her patient.[388] The

---

[379] 20 C.F.R. § 404.1527(e)(1); *Denton v. Astrue*, 596 F.3d 419, 424 (7th Cir. 2010).
[380] R. at 28.
[381] *Id.*
[382] R. at 28.
[383] *Stephens v. Heckler*, 766 F.2d 284, 289 (7th Cir. 1985).
[384] *Micus v. Bowen*, 979 F.2d 602, 608 (7th Cir. 1992).
[385] *Micus*, 979 F.2d at 608; R. at 28.
[386] *Moss v. Astrue*, 555 F.3d 556, 560–61 (7th Cir. 2009).
[387] R. at 28.
[388] *Punzio v. Astrue*, 630 F.3d 704, 712 (7th Cir. 2011).

ALJ can examine whether the treating physician's opinion is both well supported by medically acceptable diagnostic techniques and consistent with other evidence in the record, and this process will "weed out" those physicians who either are poorly versed in their patient's condition or unable to diagnose their patient objectively.[389] In this case, the ALJ stated that he was concerned about Dr. Jones' potential bias, but he did not engage in this "weeding out" process.[390] The ALJ cited no evidence, other than the fact that Ms. Sherwood's attorney requested an opinion from Dr. Jones, to indicate that Dr. Jones' opinion was sufficiently unreliable, and thus reasonably disregarded.[391]

Ultimately, we conclude that the ALJ did not minimally articulate his reasoning for discounting Dr. Jones' opinion and that the ALJ did not consider the full range of medical evidence in the record in determining that Ms. Sherwood was not disabled within the meaning of the Social Security Act.[392]

## C. The RFC Determination

Ms. Sherwood finally argues that the ALJ erred in his determination of her RFC, and more specifically claims that the ALJ erred in: (1) determining that she could do light work, (2) not considering the side effects of her medication, and (3) ignoring that she will need a position change after twenty minutes of standing.[393] The Commissioner responds that substantial evidence supports the ALJ's determination that Ms. Sherwood could perform her past relevant work as a school bus driver.[394]

---

[389] *Punzio*, 630 F.3d at 712.
[390] R. at 28.
[391] *Id*.
[392] R. at 28.
[393] Pl. Mem. at 14–16, dkt. 21.
[394] Def. Mem. at 10, dkt. 27.

In this case, the ALJ stated that the records and Ms. Sherwood's testimony indicated that Ms. Sherwood was capable of performing past relevant work as a school bus driver and packager.[395] However, based on the issues described above relating to the ALJ's decision to discredit Ms. Sherwood's credibility and to discount the opinion of Dr. Jones, the ALJ's RFC determination should also be reconsidered in conjunction with the full range of medical evidence.[396] As we stated, we are unable to determine whether he considered the record as a whole.[397] While the ALJ supported his finding with testimony from the VE and from Dr. Ghanayem, he made no attempt to explain why the other evidence in the record was overcome by the evidence that he relied on.[398] Again, while an ALJ need not consider every piece of evidence or testimony in the record,[399] the ALJ's analysis must provide some insight into the reasoning behind his decision.[400] Thus, Ms. Sherwood's RFC should also be reconsidered upon remand.

When readdressing Ms. Sherwood's RFC, the side effects of Ms. Sherwood's medications should also be taken into consideration.[401] Since the side effects of medication can significantly impact a claimant's ability to work, these side effects should be considered during the disability determination process.[402] None of the three hypotheticals that the ALJ posed to the VE included Ms. Sherwood's medications as factor.[403] Earlier in the hearing, Ms. Sherwood had testified that she was currently taking hydrocodone, Naproxen, and Prozac throughout the day,[404] and there are

---

[395] R. at 29.
[396] *Zurawski*, 245 F.3d at 888.
[397] *Id.*
[398] *Id.* at 889.
[399] *Clifford,* 227 F.3d at 870.
[400] *Zurawski*, 245 F.3d at 889.
[401] *Flores v. Massanari*, 19 Fed. Appx. 393, 399–400 (7th Cir. 2001).
[402] *Flores*, 19 Fed. Appx. at 399.
[403] R. at 60–65.
[404] R. at 43–45.

handwritten notes in the record from Dr. Jones indicating that Ms. Sherwood cannot drive if she has taken her pain medication.[405] If her medications do in fact prevent her from driving, they would also prevent her from working as a school bus driver.[406] Consequently, when reconsidering Ms. Sherwood's RFC upon remand, the combination of her current medications should be discussed in determining whether she can perform past relevant work.[407]

Lastly, the Commissioner argues that Ms. Sherwood cannot challenge the testimony of the VE because she did not object to his testimony during the administrative hearing.[408] It is true that if a claimant does not object to a VE's testimony during an administrative hearing, then she forfeits this argument in later proceedings.[409] However, Ms. Sherwood does not challenge the statements of the VE regarding the requirements of being a bus driver but, instead, questions the ALJ's determination, based on the VE testimony, that Ms. Sherwood could satisfy these requirements.[410]

In summation, on remand, the ALJ shall reevaluate Ms. Sherwood's complaints of pain, Dr. Jones' opinion, and Ms. Sherwood's RFC with due regard for the full range of medical evidence.[411]

# V. CONCLUSION

---

[405] R. at 345, 347, 349.  These notes were written in 2006 and do not describe which medications or which combination of medications would be problematic for Ms. Sherwood's driving. *Id.*
[406] R. at 28.
[407] *Flores*, 19 Fed. Appx. at 399; R. at 28.
[408] Def. Mem. at 11, dkt. 27.
[409] *Liskowitz v. Astrue*, 559 F.3d 736, 744 (7th Cir. 2009).
[410] Pl. Mem. at 14–16, dkt. 21.
[411] *Zurawski*, 245 F.3d at 888.

For the reasons stated above,  the Commissioner's motion for summary judgment is denied

[dkt. 26] and Ms. Sherwood's motion for summary judgment is granted [dkt. 20]. The case is

remanded to the SSA for further proceedings consistent with this opinion.

**IT IS SO ORDERED.**

**Date:** <u>November 28, 2012</u>

_____
SUSAN E. COX
U.S. Magistrate Judge